The appellees, Brosius Le Compte, sued the appellant, the St. Louis San Francisco Railroad Company, and the Paris 
Great Northern Railroad Company, in the County Court, to recover the sum of $365, claimed as damages to a shipment of live stock delivered to the first-named railroad company at Lockwood, Missouri, on the 6th day of January, 1906, to be shipped to Paris, Texas. The trial resulted in a verdict against the appellant, St. Louis San Francisco Railroad Company, from which that company prosecutes this appeal.
Brosius Le Compte, at the time of this shipment, were engaged in the business of buying, shipping and selling mules, with their place of business at Paris, Texas. On the date above mentioned J. B. Brosius, one of the firm, was in Lockwood, Missouri, where he purchased from a dealer twenty-four (24) mules which he desired to ship to Paris for sale. The mules were loaded into a car of the appellant at about two o'clock on the evening of the 6th day of January, 1906, to be shipped to Paris via Monett, Ft. Smith and Hugo. The car containing the mules arrived at Monett at 2:15 on the morning of January 7th, and remained there until about five o'clock that evening. Brosius accompanied the train containing the car of mules that far; but, upon being informed by the yardmaster at Monett that the mules would not be unloaded there, went on to Paris on the regular passenger train. At about 9:30 on that morning one of the appellant's employes directed that the car of mules be unloaded for the purpose of complying, as they testified, with the law of Congress requiring stock to be unloaded, watered, fed and rested. The mules were again loaded at about 5:30 in the evening, and arrived in Paris shortly after midnight on January 9th. At about 7:30 of the same morning they were delivered to the appellees, and by them taken to their barn in Paris.
The testimony shows that, upon their arrival at Paris, one of the animals, a red horse mule, had a large, triangular cut on the right side of his hip, but it was not observed at the time that any of the other mules were in any way damaged. On arriving at the barn appellees discovered that a large bay mare mule, for which they had paid $225, and which they valued at $250 in the market at Paris, was sick. They at once procured medical attention by summoning Dr. Cook, a veterinarian, who testified at the trial that, when he examined the animal, it had pneumonia in its second stage. The mule subsequently died.
This suit is to recover the damages to the wounded animal and the value of the mule last above named.
In their amended original petition, upon which this case was tried, the appellees make two distinct charges as to negligence against the appellant, each seeking to account for the two distinct injuries to the two mules. The first allegation is as follows: "That by reason of the *Page 650 
holding of said mules in said pen at Monett, and by reason of the unnecessary and unusual delay in transit at Monett, and between Monett and Paris, due to the negligence of these defendants and each of them, the first-named bay mare mule contracted a cold, or pneumonia and fever, became sick, and was seriously ill and suffering upon arrival of this shipment at Paris, which sickness was aggravated and increased by the unnecessary and unusual delay in transit." The second allegation is as follows: "That the last-named red horse mule reached Paris cut, bruised and injured by reason of said defective and dangerous approaches and chute at Monett, and the negligent and careless manner in which this shipment was loaded and unloaded in said stock pen and in which it was handled in the yards at Monett, Missouri, and in transporting it as hereinabove set forth; and was so cut and torn by reason thereof, and on account of a projecting bolt in said car, that his value was greatly decreased." They also asked for the recovery of $40, alleged to be the reasonable amount paid for medical attention given the mule that died from pneumonia. Proof was offered as to the value of the mule that died, and the damages which resulted to the injured mule by reason of the cut above described; also as to the value of the services rendered by a veterinarian in treating the sick mule. The jury returned a verdict in favor of the plaintiffs, in the court below, for the sum of $340.
The first assignment of error presented by the appellant calls in question the following charge given by the court upon the issue of negligence: "3d. If you find, from the facts and evidence before you, that the defendant, the St. Louis San Francisco Railroad Company, was negligent, as that term has been herein defined, (1) either in the manner in which said company carried said mules between Lockwood, Missouri, and Hugo, I. T., (2) or in the manner in which said company handled and cared for said mules while in shipment between such points, (3) or while being loaded or unloaded, (4) or while being held in the stock pens at Monett, Missouri, (5) or in the time consumed by such shipment between Lockwood, Missouri, and Hugo, I. T.; and if you further find from the evidence that, as a result of such negligence, if any, in either or all of theabove respects; and if you should further find that such negligence, if any, was the proximate cause of injuries, if any, one of plaintiffs' mules was injured and another of said mules died; then in either or all of the above events you are instructed to find for the plaintiffs (unless, under other instructions herein given you, you should find for the defendant) for such damages, if any, as you may find resulted from such negligence, if any, of such defendant company; and that such negligence, if any, was the proximate cause of plaintiffs' injuries, if any." Appellant complains of this charge upon the grounds that there was no testimony tending to show that the appellant was guilty of any negligence in any of the respects alluded to in this charge.
It will be observed that in this case we have two distinct injuries to two different animals, each of the injuries being necessarily attributable to wholly different causes. The bay mule is alleged to have contracted a cold from which pneumonia resulted, by reason of holding the mules in an unsanitary stock pen at Monett and an unnecessary and unusual *Page 651 
delay in transporting from that place to Paris. The wounded animal is alleged to have received the cut from a bolt projecting in the car, and by reason of the negligent manner in which the shipment was loaded and unloaded in Monett, the defective and dangerous approaches and chute for such loading and unloading, and the manner in which the mules were handled while in transit between Monett and Paris. Negligence in carrying the mules between Lockwood and Paris, or negligence in handling the mules while being loaded and unloaded at Monett, might have caused the injury to the wounded animal, but could not have been the cause of the bay mule's contracting pneumonia; on the other hand, holding them in unsanitary stock pens, exposing them to inclement weather, and delay in transporting from Monett to Paris, might have caused the bay mule to contract a disease from which it died, but could not be said to have contributed in any way to the cut on the wounded mule. Yet the charge complained of directs a finding for the plaintiffs, without distinction as to the injuries, if the jury should find that the appellant was guilty of negligence in any or all of these respects. Under this charge the jury was, in effect, told to find for plaintiffs for the damages to the wounded mule if they believed the appellant was negligent while the mules were being held in the stock pens at Monett, or in the time consumed by such shipment between Lockwood and Hugo; they were further, in effect, told that they were authorized to find damages for the mule that died from the effects of pneumonia if the appellant were negligent in the manner of carrying the mules, or of handling them while in shipment, or while being loaded or unloaded. The acts of negligence which plaintiffs, in their original petition, charged were the cause of the existence of the respective injuries, should have been separated in the charge of the court, and each group submitted with respect to the injury it was alleged to have produced, provided there was sufficient evidence to warrant the submission. This error is not cured by the further instruction of the court that the jury must further find that the acts of negligence were the proximate cause of the injuries. To submit an issue of negligence which is clearly not even a remote cause of an injury, and then leave it to the jury to determine whether or not it was the proximate cause, does not relieve the instructions from the objection of having been given without any testimony to support it. The mere fact that the court submits an issue or question of fact to a jury, and leaves it to them to decide whether or not the fact exists, and, if found, then whether or not it was the proximate cause of the injury, is calculated to induce the jury to believe that, in the mind of the court, there is not only testimony upon which they can base a finding that the fact does exist, but that there is also testimony tending to show that that fact was in reality the direct and proximate cause of the injuries complained of.
This question then presents itself: Was there in this case sufficient evidence to warrant the court in submitting these issues of negligence to the jury? Appellant contends that there was not. The testimony must be analyzed in connection with the allegations in the pleading. Was there any evidence from which the jury could infer that the mule contracted pneumonia, or a cold from which pneumonia developed, by *Page 652 
reason of being held in an unsanitary stock pen at Monett, or the delay in transporting to Paris from that point? Was there any evidence that the stock pens were in an unsanitary condition, or that there was any unnecessary or unusual delay in the transportation from there to Paris? One of the appellees, J. B. Brosius, testified as to the location of the stock pen, and of the character and general lay of the ground at Monett, and as to the condition of the weather when he arrived there at two o'clock on the morning of the 7th of January. He did not see the stock pens on this occasion, and knew nothing of their actual condition further than that they were open and without cover. He saw them six or eight days afterwards, as he testifies, and at that time they were in an exceedingly muddy condition. Brosius left the stock there and came on to Paris. This is all of the testimony offered by the appellees as to the unsanitary condition of the stock pens at Monett. Mills and Hobbs, witnesses for the appellant, testified that the yard consisted of two pens, each pen with the capacity of two cars; that the railroad company had facilities for loading and unloading, and that the pens were in fair condition on that date. The pens were open, and were constructed as pens usually are constructed in Missouri; the soil was inclined to be sandy or gravel; and that the weather on this occasion was clear until late in the afternoon of January 7th; the pens were slightly muddy, but the mud was not deep. The stock was unloaded at nine o'clock in the morning, and remained in the pens until about five o'clock that evening; that they were unloaded to comply with the Federal law. They further testified that the stock were handled carefully and were in good condition, except one mule, which had a wound on the hip, and which appeared to have been cut by a bolt in the car. That there was some rain in the afternoon, but the weather was not freezing, and there was no snow or ice, and the thermometer registered 34 degrees above zero in the afternoon of January 7th. It is clear from this testimony that no negligence is shown on the part of the appellant or any of its employes, in unloading and detaining the stock at Monett for the time they did. The law requires that stock being shipped over railroad lines shall not be kept longer than twenty-eight (28) hours without being unloaded, watered, fed and rested. Appellant had the right, if it was not its duty, to unload and rest this carload of stock at the time and place it did; they had been in transit, from the time they were loaded, about nineteen hours, and could not have been carried much longer without violating the provisions of the Federal law upon that subject. The only evidence of negligence in this regard, if such can be regarded as evidence of negligence, is the fact that one of the mules afterwards developed pneumonia and died. Was there any negligence in the delay in the shipment between Lockwood and Hugo? We are left without any evidence from which to determine whether there was delay or not, except for the meagre statement of Brosius himself; he testified: "I do not know what is the usual and customary time for trains of this character to make between Lockwood and Paris; I was about eight hours actually on the road from Springfield to Monett, as we said about two hours in Springfield. We usually figure on ten to twelve hours from Monett to Ft. Smith, and about the same time from Ft. Smith to Paris, making in all about eighteen *Page 653 
to twenty-four hours from Monett to Paris." The stock left Monett at 6:30 on Sunday evening, January 7th, arrived in Paris about 1:30 Tuesday morning, January 9th, consuming about thirty-seven (37) hours, or thirteen hours more than Brosius testified that he usually figured on. There is a total absence from the record of any evidence whatever showing how the shipment was handled between Monett and Ft. Smith, or what time it arrived at the latter point. A. Green, a witness for the appellant, testified that he handled the car containing the shipment between Ft. Smith and Paris, a distance of 169 miles; that he left Ft. Smith at 10:20 p. m. and arrived at Paris at 1:35 a. m.; that his running time was twelve miles per hour — that that was about the running time per hour of such trains for that division. He testified to delays along the way which were made necessary by the conditions under which the shipment was made, and says that they were necessary and usual; that this was a second-class train, and they had only limited trackage rights. This is all the testimony in the record as to any unusual or unnecessary delay between Monett and Paris.
The animal that was wounded carried with it the evidences from which negligence sufficient to cause its injuries might have been inferred by the jury; and therefore as to so much of those acts of negligence about which the court instructed the jury as would have likely been productive of that sort of an injury there was sufficient evidence to submit the issue to the jury. But in doing so the court should have instructed the jury what injury, if any, they might find from such facts. On the other hand, the mere fact that an animal at the end of its journey over a railroad develops a case of pneumonia is not of itself evidence of negligence, as was the cut on the horse mule. It can hardly be urged that the giving of this charge was harmless, for there was evidently some factor that influenced the jury in arriving at the verdict giving the appellees damages for the value of the mule that died, upon evidence wholly insufficient to sustain such a finding. Dr. Cook, a witness for the appellees, was the only one who testified as to what conditions would likely bring about the disease. He was called upon to see the animal that developed pneumonia within a short time after its arrival in Paris. He says: "From the symptoms when I first saw her I would say that she was in the second stage (of pneumonia), and had had the disease three orfour days, that was the condition I saw her in. Pneumonia results from several causes. Taking cold, or the sudden cooling when the animal is heated, causes congestion of the lungs, and in from 7, 8 to 10 hours it gets in the second stage. If this mule had been loaded on a car about two o'clock in the afternoon of January 6th, and kept in the cars from that time till two o'clock the next morning, and then unloaded from the cars and put in a stock pen unprotected from the weather, and muddy, and it had been snowing, and the snow had melted, that would be a good factor in giving the mule pneumonia. . . . No, this mule could not have contracted this disease in the stock pens at Paris; that would have been impossible." On cross-examination he also testified: "Yes, I said there were several causes for pneumonia — impure air, where the air is too warm, and inhaling impurities, or where the air is poisoned by fumes, fumes from manure, or fumes from heat, or any irritating substances. If *Page 654 
there was no ventilation in a barn the size of the building, with an alley six or eight feet wide down the center, with stalls in the building containing from 40 to 80 or 100 head of mules and horses, then take this mule out and walk or trot it around briskly for four or five minutes, then put in a muddy stock pen with snow on the ground, it could cause pneumonia — it might produce it. If an animal was taken out of a warm barn like you have described, and exercised until the skin got moist, and the perspiration stood on it, and then allowed to stand in an unprotected stock pen, with snow on the ground, it might get chilled and cause pneumonia. . . . There would be danger if they (mules) were unloaded from the cars and allowed to stay in the stock pens any length of time, but if they were unloaded and moved around until they were placed in a place where it was warm and no draft could get on them, there would be no danger. I have known of animals contracting pneumonia from standing in the stables and breathing impure air, but I do not know personally of an animal contracting pneumonia in a stable like that of Brosius Le Compte, without any other cause, although it is recorded that it has been done. If animals were unloaded in stock pens, such as have been described at 9:30 in the morning, and kept there until five o'clock in the evening, an animal might contract pneumonia and show it before he left the pen in the evening — he might have the chill. . . . If this mule had pneumonia when she was unloaded from the car — a well-developed case, in either the first or second stage — it might not have been apparent to anyone looking at her by her pinched, drawn appearance, as when mules are unloaded from the cars they get excited and run about, and might not show until they get to rest again." There were other details of his testimony relating to the various stages of development and symptoms, unnecessary to notice here. J. B. Brosius testified that he bought the mules from Pyle Bros.; that their barn was cut up in pens, four on each side of an alley; each one of the pens would hold about fifty mules; that it was somewhat like an alley-way cut through this house (meaning, we suppose, the court house), with plank fences separating the pens. He saw the mules in the pen, but did not know how long they had been there — was informed that they had been there only a short time; the barn was inclosed on all sides, "just like this house." He supposed it was one o'clock when they took the mules out to the stock pen (at Lockwood); he telephoned to the barn to bring the mules down. The stock pens were muddy, and were from four to ten inches deep in mud, requiring the men who worked in them to wear rubber boots; it was open and unprotected from the weather. He did not think the mules stood in the pens an hour before they were put on the car — thought it was about twenty or thirty minutes; they were loaded into a regular stock car. He further stated that before leaving Lockwood he had a man put a halter on the mule that died, and her mate, and trot them up and down in front of the barn, and that they appeared to be in perfect health. He further testified that he knew that if you took mules or cattle out of a warm barn and put them in a stock pen like that, and then loaded them on a stock car, they were likely to take cold, but that he had had pretty good luck both before and since. *Page 655 
In our opinion there was sufficient evidence to justify the court in submitting to the jury the issue as to whether or not the injuries to the red horse mule were the result of the negligence of the appellant. When an animal is delivered to a carrier in a sound condition, and arrives at its destination injured by cuts, wounds or bruises, such as that shown to have been sustained by this mule, the burden is on the carrier to show that the injuries resulted from some of the causes for which it is not liable. Even when the shipment is under a contract limiting the common-law liability of the carrier, such an injury, when shown to have been received during transportation, puts upon the carrier the burden of showing, not only that the injury comes within the exemptions to which it is entitled under the contract, but that it was inflicted without its negligence or that of its servants. Ryan v. Missouri, K. T. Ry. Co., 65 Tex. 13; Texas P. Ry. v. Richmond, 94 Tex. 571; Houston T. C. Ry. v. Bath, 17 Texas Civ. App. 697[17 Tex. Civ. App. 697]. It is true that Brosius, one of the plaintiffs in the court below, accompanied the shipment as far as Monett. But at that point, the testimony shows, on being informed by one of the appellant's servants that the mules would not be unloaded, he took the regular passenger train and went on to Paris. Under these circumstances he was not in charge of the car in such a manner as to shift upon him the burden of showing what negligence, if any, probably resulted in the injury complained of, and the appellant's contention is without merit.
If the rule stated above, that when an animal is delivered to a carrier in a sound condition, and is received at the end of the shipment in an injured or unsound condition, is applicable alike to all classes of injuries and disorders that may befall live stock in transit, without exception as to the nature and probable origin of such injuries or disorders, then the court committed no error in submitting the issue of liability for the loss resulting from the sickness and death of the mule shown to have been afflicted with pneumonia, and which subsequently died from its effects.
But if a distinction is to be made between those injuries which, from their nature and origin, bear evidence of having been caused by violence or neglect, while being transported by the carrier, and those which frequently or necessarily result from natural causes, or from conditions over which the carrier has no control, then there was error in this charge. If a burden rested upon appellant to account for the origin of the disease, and to show absence of negligence on its part, then the court properly submitted the issue, and it was the province of the jury to determine whether or not this had been done. In this State a carrier assumes the same degree of liability in the carriage of live stock as it does in any other class of freight, subject to such exceptions, on account of the inherent nature of the property, as justice and common fairness would impose. Missouri Pac. Ry. v. Harris, 67 Tex. 166. We know of no established rule by which to determine with exactness in every case what injuries furnish, from their mere presence, prima facie evidence of negligence, and those that do not. But we feel sure that the mere fact that an animal, apparently sound when delivered for shipment, arrives at its destination sick with a disorder, such as pneumonia, should not raise the presumption that the carrier had been *Page 656 
guilty of negligence which caused it. Weed v. International 
G. N. Ry., 53 S.W. Rep., 356; Louisville N. Ry. Co. v. Wathen, 49 S.W. Rep., 185; Id., 66 S.W. Rep., 714; Hussey v. Saragossa, 3 Woods C. C., 380; New York, L. E. W. R. R. Co. v. Estill, 147 U.S. 617; Long v. Pennsylvania Ry. Co.,23 A. 459; 14 L. R. A., 741; Schaeffer v. Philadelphia R. Ry. Co., 168 Pa., 209; 31 A. 1088; Pennsylvania Ry. Co. v. Raiordon, 119 Pa. St., 577; 13 A. 324. Pneumonia is a well-known and malignant disease, attacking both man and beast at times when least expected, and frequently under conditions which shroud its cause and beginning in mystery. Medical science has not yet reached that stage when it can, with any degree of certainty, predict or prevent its development in animated beings. Appellees alleged in their petition the nature of this animal's disorder, and thereby assumed the burden of proving negligence on the part of appellant as the cause of the disease. If the appellees have failed to adduce evidence sufficient to justify a jury in finding that appellant's negligence caused this mule to contract and die of this disease, then the court committed reversible error in even submitting the issue. It is useless for a trial court to submit an issue of fact to a jury upon testimony too meagre to support a finding either way. We think the testimony in this case was wholly insufficient to show that negligence on the part of the appellant caused the appellee's mule to contract pneumonia, or to show that it was aggravated by any delay in the transportation from Monett to Paris, Texas. The unloading at Monett, or at some other point in the route, was necessary to be done to comply with the Federal statute prohibiting railroads from confining stock in cars longer than twenty-eight consecutive hours without unloading for the purpose of feeding, watering and resting them at least five hours. Was there any reason why this should not be done at Monett? At that season of the year the weather was precarious and uncertain; even the next day it might have been much more unfavorable. The only persons who testified, from their actual knowledge of the weather conditions at that place on that day, say the temperature was higher than on the preceding day, and that the pens were in fair condition. There were twenty-four mules in this shipment, all subjected to the same conditions as to confinement, exposure and climatic changes, yet only one developed pneumonia, and that one the largest and physically the best developed in the entire list, except her mate. Brosius testified that it was the best pair of mules in the lot. Dr. Cook does not say that pneumonia necessarily would result from the unloading at Monett, but that it might. He was then merely answering an hypothetical question, based upon assumed conditions, not fully warranted by the testimony of the witnesses, not giving his conclusion from actual observations of the conditions under which the mules were unloaded. In another portion of his testimony he said that, when he saw the animal, he inferred, from its symptoms, that it had contracted the disease three or four days prior to that time. He saw it on the very day of its arrival and within a short time afterward. If he is correct in his diagnosis, then the animal had evidently contracted the cold on the day, or day before, the stock were delivered to the appellant.
We think the jury, in arriving at its verdict, was probably misled by *Page 657 
the instructions of the court in authorizing a finding generally for appellees, if it were found that the appellant had been negligent in any or all of the respects mentioned in the charge before quoted.
Under his second assignment of error the appellant assails the correctness of the following charge of the court: "If, however, you should find from the evidence before you that such shipment was carried by said defendant, the St. Louis San Francisco Ry. Co., under a written contract with plaintiff, John B. Brosius, wherein plaintiff agreed to care for, load and unload, feed and water such stock, and such contract was upon a valuable consideration; then should you further find from the evidence that said defendant furnished to plaintiff facilities and means for loading and unloading, feeding and watering such mules, which was suitable and adequate for such purpose, insofar as was possible by the exercise of ordinary and proper care and prudence, and that the injuries to plaintiffs' said mules, if any, were caused by plaintiffs' failure to care for, load and unload their said mules, after being given an opportunity by defendant to do so, then you shall find for the defendant, the St. Louis San Francisco Ry. Co., for all damages, if any, resulting from plaintiffs' failure in any or all of the above respects." Appellant contends that the vice of this charge was in submitting to the jury the issue as to whether or not this contract had been executed upon a valuable consideration; that contract being in writing, a valuable consideration would be presumed. It is true that a written contract imports a valuable consideration, but does not conclusively presume one. McFadden v. Ry. Co., 4 S.W. Rep., 691; Hutchinson v. Carr, secs. 122, 123. Under proper pleadings, such as were filed by the plaintiffs in this case, this presumption of a consideration may be rebutted, and the fact shown that none in reality existed; and for that reason the contract is not enforcible. Brosius testified that he had a verbal understanding with the agent at Lockwood as to the rate to be paid as freight and the route the mules were to take, but what this rate was is not stated either by Brosius or in the written contract. He says he was not called upon to sign any written contract till a short time before the car containing the mules was ready to start. He also stated that but one rate was mentioned to him by the agent. In all of this he is uncontradicted. The agent himself testified that he only had two rates to offer shippers, and both contained forms of contracts limiting the company's liability in the usual way; one rate restricted the liability of the carrier to a sum not to exceed one hundred dollars per head for the animals, in case of loss or injury; the other was 25 percent higher, but permitted a recovery for the full amount of damages in the event of loss or injury. Brosius says he never read the contract, and did not know what was in it; that he had signed many of them before but had never read one; that he assumed they had to be signed or the company would not carry the stock. B. L. Young, the assistant agent at Lockwood for the appellant, testified that he did not know what rate was paid by Brosius; that none was paid to him; that whatever rate Brosius promised to pay under the written contract was the regular tariff rate. Under this testimony we think the court properly submitted the issue of consideration to the jury. If the rate paid by *Page 658 
plaintiffs was the regular tariff rate which the appellant had established for and did carry such freight without limitation upon its common-law liability, then this contract was without consideration. But if the amount contracted for and paid was the rate established and used for contracts wherein the carrier was, by agreement with the shipper, relieved from some of its common-law liabilities, and this was less than the former rate, then the consideration based upon transportation is sufficient. The carrier is required to have a rate, reasonable in its terms, at which those who do not choose to release it from its common-law liabilities may have their goods transported. If in compliance with this requirement it fixes and publishes such a rate, then there must be some consideration in the way of a concession or reduction from this rate, in order to support contracts releasing it from some of those liabilities imposed by common law. Gulf, C. S. F. Ry. Co. v. Stanley, 89 Tex. 42
[89 Tex. 42]; Gulf, C. S. F. Ry. v. McCarty, 82 Tex. 608
[82 Tex. 608]; Missouri, K. T. Ry. v. Carter, 9 Texas Civ. App. 677[9 Tex. Civ. App. 677]; Ward v. Missouri Pac. Ry., 58 S.W. Rep., 28; Illinois Cent. Ry. Co. v. Lancashire Ins. Co., 79 Miss. 114; 30 So. Rep., 43; Wehmann v. Minneapolis, St. P. S. Ry. Co., 58 Minn. 22; 59 N.W. 546; Ficklin v. Wabash Ry., 93 S.W. Rep., 847; Griffin v. Wabash Ry. Co., 91 S.W. Rep., 1015; Ficklin v. Wabash Ry. Co., 92 S.W. Rep., 347; Louisville N. Ry. v. Gilbert, 12 S.W. Rep., 1018; Atchison, T. S. F. Ry. v. Mason, 4 Kans. App., 391;46 N.W. 35; Atchison, T. S. F. Ry. Co. v. Dill, 48 Kans., 210; 29 N.W. 149. This disposes of appellant's third assignment of error also.
Appellant requested a special charge wherein it sought to have the jury instructed that, if they believed that the plaintiffs accepted a defective car, and undertook to repair the same, then plaintiffs were not entitled to recover if the injuries resulted from the defects in the car so accepted. The refusal to give this instruction is made the basis of appellant's fourth assignment of error. It is contended that by accepting the car and undertaking to place it in condition for shipment plaintiffs waived any claims they might otherwise have because of injuries resulting from any defective condition of the car. Brosius was tendered a car, and only one; he merely "bedded it down" for the comfort of his mules, and nailed some plank around to prevent the mules from getting their feet through openings. He had the right to rely upon appellant to furnish him a safe car wherein to transport his stock. A failure to furnish such a car would be negligence on the part of appellant, and such negligence, if there were any, was not waived by the acts of Brosius in what he did toward making the car comfortable and safe from the protrusions of the animals' feet. We think the court correctly refused to give the charge. Hunt v. Nutt et al., 27 S.W. Rep., 1031; Galveston, H. S. A. Ry. v. Silegman, 23 S.W. Rep., 298; Lenard v. Whitcomb, 70 N.W. Rep., 818; Louisville N. Ry. v. Dies, 18 S.W. Rep., 266.
In its fifth assignment of error the appellant complains of the refusal of the court to give the following special charge: "You are instructed that, by the terms of plaintiffs' contract with the defendants, it was the plaintiffs' duty to see that said shipment was properly loaded into a suitable car, and that said shipment was in the control and care *Page 659 
of plaintiff while it was being loaded and unloaded from the cars into the pens, and if you believe from the evidence that the plaintiffs loaded, or caused said shipment to be loaded, into the cars at Lockwood, Mo., and accompanied the same to Monett, Mo., for the purpose of caring for same, and you further believe that plaintiff left said shipment at Monett, Mo., and did not, after its arrival at Monett, Mo., care for the same, or accompany it to its destination, and you believe that the failure of plaintiff to continue with and care for said shipment, if he did, contributed to or caused the injury to the same, then you are instructed that for such injury so sustained the plaintiffs can not recover of defendants." This instruction assumes that the written contract was executed upon a sufficient consideration, and bound Brosius to accompany the car of mules and to care for them while in transit. We think this assumption in the charge was sufficient to justify its refusal, even had there been any testimony that the injuries resulted from the failure of Brosius to remain with and care for the stock. It can hardly be denied that the cut on the wounded mule was caused by a protruding bolt in the car in which it was confined, and nothing that Brosius would have been required to do under the terms of this special contract would have relieved appellant from its legal duty to furnish him a car free from such defects. Had the evidence been sufficient to show negligence upon the part of appellant's servants in unloading the mules at Monett sufficient to cause the sick animal to contract the disease from which it died, the fact that Brosius was not there to direct their movements, or to prevent them from thus unloading the stock, would not relieve appellant from such negligent conduct of its servants. Whatever appellant undertook to do toward the carrying of the stock, or caring for them while in transit, even though some portion was properly the duty of the plaintiff, it was bound to the exercise of proper care. The court submitted the issue of appellant's liability throughout solely upon the grounds of negligence. Appellant could not expect to escape liability in any instance for injuries resulting from its negligence in doing what it undertook to do, or was required to do, regarding this shipment. We think there was no error in refusing this special charge. But for the errors discussed and pointed out the judgment of the court below is reversed, and cause remanded.
Reversed and remanded.
 *Page 1