L. L. VAUGHN, RESPONDENT, v. ST. LOUIS-SAN FRANCISCO RAILWAY CO. ET AL., APPELLANTS.

Kansas City Court of Appeals.   April 1, 1929.

*Higbee & Mills* for respondent.

*H. J. Nelson, W. E. Shirley* and *M. C. Campbell* for appellant.

BLAND, J.—This is a suit in two counts seeking to recover damages to two shipments of hogs. The first count covers a shipment from Thayer, Missouri, to Green Castle in that State; the second from Birch Tree, Missouri, to Green Castle. On the first count there was a verdict and judgment in favor of the plaintiff in the sum of $2000, and on the second count in the sum of $600. Defendants have appealed.

The facts show that the shipment covered by the first count contained 168 stock hogs weighing about ninety-one pounds each. The initial carrier was the St. Louis-San Francisco Railway Company, but it was agreed between plaintiff's agent and the agent of that company that the shipment should move over the line of that company to Kansas City and thence to Green Castle over the line of the defendant, Quincy, Omaha & Kansas City Railroad Company. Apparently a through bill of lading was issued by the initial carrier.

There was testimony tending to show that the hogs were in first class condition at the time they were delivered to the initial carrier on April 13, 1927. They arrived at Green Castle on the morning of April 17, between six and seven A. M. Four of the hogs were not in the car when it arrived, two were dead, many were sick and about forty lay at one end of the car and it required force to get them out. The remainder walked out. The bedding in the car was wet. These hogs were taken to a barn about a quarter of a mile away. Part of them had to be hauled. They were kept there about a week or ten days. Practically all of them became sick, many died from pneumonia, the sickness from which all of them were suffering. The live hogs were subsequently taken to plaintiff's farm. Out of the entire shipment 139 of the hogs died en route and after they arrived at Green Castle, leaving only twenty-nine hogs that did not die

out of the load. Those that lived were damaged about $10 per head on account of their condition. The shipment was unaccompanied by a caretaker.

Defendants' evidence tends to show that the shipment left Thayer about 1:55 P. M. of April 13th; that there was no delay anywhere along their lines in the shipment; that the hogs arrived at Springfield at 10:30 P. M. of that day; that at noon of that day there was a cold rain with a temperature of sixty-four degrees at Springfield. The train passed through the State of Kansas and arrived at Kansas City at 7:05 P. M. of April 14th, and left for Pattonsburg over the line of the defendant, Quincy, Omaha & Kansas City Railroad on April 15th at eight A. M. The hogs were inspected at Kansas City and one hog was found dead, which was left in the car. The hogs were fed and watered in the car at Kansas City at nine P. M. on April 14th. They were fed two bushels of corn. Defendant's witness who had charge of feeding the hogs at Kansas City stated that the Government requirement was to feed two bushels and that he had taken up the matter with the defendant, St. Louis-San Francisco Railway Company, "and they decided that less than four bushels wouldn't be a decent feed for that number of hogs, and I always fed four bushels at Kansas City unless otherwise ordered.

The shipment arrived at Pattonsburg the evening of April 15th. The servant of the terminal carrier, who watered the hogs there, found that the water trough in the car had been "mashed up." He placed a water trough therein and watered the hogs. This witness had nothing to do with the feeding of the hogs. He stated that at Pattonsburg six or eight hogs were "bunched up on the east end of the car, one was dead;" that "most of them drank, but the ones that were piled up didn't drink." He did not remove the dead hog. The trough was taken out by the agent the next morning. The men who watered them kicked thirty or forty of the hogs in an effort to get them up. Defendant's evidence further shows that the hogs were fed two bushels of corn at Pattonsburg during the afternoon but that they were not fed at Pattonsburg the next morning.

The shipment left Pattonsburg at 6:45 A. M. of April 16th and arrived at Milan at 12:50 P. M. of the same day. The hogs were fed and watered at Milan at 4:15 of the same day, the section foreman placing a trough in the car for the purpose of watering them. After he watered them he fed them two bushels of corn. He found three dead hogs in the car which he removed. He later came back to the car and found another dead hog which he had overlooked, which he likewise removed. After the car returned from Green Castle he found two more dead hogs in it. He testified "when I went to water them the hogs were all piled up. The dead ones were

scattered in the car. The hogs were in bad condition I would judge, . . . They acted sick to me." The feed bills presented to the plaintiff by the railroad show that the hogs were fed from two to three bushels of corn each day during transit.

There was evidence on behalf of plaintiff tending to show that the weather was good at the time this shipment started; that it was not cold or chilly. Defendants introduced the record of the weather bureau as to the weather at Birch Tree, a place forty miles distant from Thayer. This shows a fall of more than an inch of rain each day at Birch Tree on April 13th, 14th and 15th. The weather report also showed more than an inch of rain at Springfield on April 13th and more than two inches on April 14th. The maximum temperature at Birch Tree on April 13th was sixty-four degrees; minimum fifty-four degrees. The minimum temperature at that place between April 13th and April 21st was forty-one degrees. On the 14th of April the minimum temperature was fifty-eight degrees at Kansas City.

There was testimony on the part of the plaintiff tending to show that the hogs became sick by reason of having contracted pneumonia during their transportation and that they did not suffer from cholera. The hogs had not been vaccinated for cholera before leaving, but the State authorities issued a permit allowing the shipment to leave Thayer on condition that they would be vaccinated upon their arrival, which condition was complied with by the plaintiff.

One witness on the part of the defendant testified that only two per cent of pneumonia in hogs is unaccompanied by cholera and the former appears in the latter stages of the latter. While there was much evidence tending to show that exposure will cause pneumonia, another witness for the defendants testified that pneumonia not accompanied by cholera is not caused by exposure "to any great extent," "the percentage in a car of hogs of 150 or 160 that would take pneumonia from exposure would not exceed over two or three per cent." This witness further testified that

"Assuming that if the hogs didn't have cholera or any other disease when they were loaded in the car and they were four or five days in the car and when they arrived a large number were sick or soon became sick with pneumonia, it is probable that the handling in the shipment contributed to bring about that condition."

There was evidence on the part of the plaintiff that the proper feed for these hogs would have been ten or twelve bushels of corn each day during transit. There was also evidence tending to show that a deficiency in the feed of hogs during a shipment of that kind and the transportation of them in wet bedding would tend to weaken their resistance, permitting them to contract pneumonia.

No negligence is charged in the petition, but it merely alleges that the hogs were delivered to the initial carrier in good condition and were received by the plaintiff from the terminal carrier in a sick condition, some of them being dead.

It is insisted by the defendant, St. Louis-San Francisco Railway Company that its demurrer to the evidence should have been sustained. In this connection it is claimed:

"Plaintiff's evidence is that the hogs were sick of a specific disease, to-wit, pneumonia; that exposure may cause pneumonia; that the shipment was for a distance of nearly five hundred miles. It would be impossible to make such a shipment without exposure, and it was not shown that the sickness was not caused by the inherent infirmity of the animals."

It is further argued in connection with this point:

"That the shipment originated at a time when the weather was cool and was transported from Thayer to Kansas City during rainy weather. Necessarily no matter how promptly or carefully the shipment was handled from Thayer to Kansas City, the hogs were necessarily exposed and the evidence is that exposure may produce the specific disease from which the hogs were suffering. The uncontradicted evidence is that the shipments were moved according to the schedule of said defendant's road."

There is testimony on behalf of the defendants that "pneumonia is brought on by sudden congestion of the lungs, induced by chilling or overheating or exhaustion." There is no direct testimony anywhere in the record that the condition of rain and cold weather had anything to do with bringing on the pneumonia in this instance. We cannot take judicial notice that a minimum temperature of forty-one degrees on a single day is injurious to a carload of 168 hogs *in transit*. However, even if by reason of the testimony in connection with the weather and the fact that the hogs were transported over such a long distance, the jury could arrive at the conclusion that exposure had something to do with the diseased condition of the hogs, yet, this would not necessarily exhonerate defendant. If their negligence combined with the exposure to cause the injury, defendants are still liable. [Moran v. Railway, 255 S. W. 331.]

There is no testimony as to whether defendant used any care in protecting the hogs from exposure while they were in the various switchyards along the way, but there was ample evidence tending to show negligence on the part of both defendants. The evidence shows that the hogs were underfed; that the bedding was wet and it is conceded that defendants did not comply with the twenty-eight-hour law providing that stock of this kind shall not be confined in a car more than twenty-eight consecutive hours without their being unloaded in a humane manner into properly equipped pens for rest,

water and feed, etc. [Vol. 44, Part 1, U. S. Statutes at Large, 69th Congress, p. 1444, chapter 4.]

Defendant claims that this shipment comes within the provisions of section 73 of the Act in question, providing that such animals may be carried in cars longer than the time specified in the act "in which they can and do have proper food, water, space and opportunity to rest," and that in such case "the provision in regard to their unloading shall not apply." The burden was upon the defendant to show that it came within the proviso. To meet this burden defendant contends that plaintiff "provided that feed and water should be furnished in the car." In this connection defendant states that plaintiff placed a water trough in the car at Thayer. While there is some evidence that a trough was in the car at that place there is no testimony as to who placed it therein. Whether the provision of section 71 of the Act could be waived in any other manner than in said section provided, that is by a written request of the owner or person in custody of the shipment that the time of confinement be extended to thirty-six hours, we do not think there is any merit in this contention that the shipper indicated that this was a shipment that was not required to be unloaded. While it is true that plaintiff placed feed and bedding in the car at Thayer, the feed was only sufficient for one day or twenty-four hours.

The jury could have found that the confinement of these hogs in the car for such a length of time, under the circumstances shown in the evidence, contributed to their becoming in a weakened condition resulting in pneumonia. The demurrer to the evidence of the defendant, St. Louis-San Francisco Railway Company was properly overruled.

It is contended by the defendant, Quincy, Omaha & Kansas City Railroad Company, that its demurrer to the evidence should have been sustained. In this connection it is argued that this company is not liable for anything that occurred on the lines of its co-defendant, the initial carrier. This might ordinarily be true, but the evidence shows that the negligence of the initial carrier was continued by the delivering carrier and was of the same kind and character, and the jury could well find that they both combined to cause the damage to the health and to the death of the hogs. The terminal carrier failed to properly feed the hogs and permitted the bedding to become or continue in a state of wetness, and it was required under the Federal Statute, supra, to take notice of the length of time that the animals had been confined by the initial carrier. [10 C. J. 540.] Under the circumstances there is no question but that both the carriers were jointly liable. [B. & O. S. W. R. R. v. Wood & Co., 130 Ky. 839.] It cannot be reasonably said that the wrongs committed by the two carriers were separate and distinct. [Walker v. Railroad, 162 Mo. App. 374.]

We have examined the case of Utz v. C., B. & Q. R. R., 208 S. W. 640, and find it not in point. While that case holds that the connection carrier is not liable for any act of the initial carrier, it does not involve the question of joint negligence of two or more carriers combining to cause the injury.

We think, however, that the complaint made against plaintiff's instruction No. 4 is well taken. There is no evidence of failure to transport the hogs within a reasonable time as submitted in the instruction. While it is true that there is testimony on the part of the plaintiff that the agent of the initial carrier at Thayer agreed with plaintiff's agent to transport the hogs so that they would arrive at Green Castle on the morning of April 15th between six and seven o'clock, this agreement cannot be relied upon, for such agreements are considered as giving an undue privilege to the shipper, and therefore, working a discrimination among shippers. [Underwood v. Hines, 222 S. W. 1037.] The only duty upon the defendants was to transport the shipment with reasonable dispatch and due diligence. [10 C. J. 540.] However, the petition is not grounded upon a violation of any such special contract.

The instruction also is bad in placing the burden upon the defendant to show that there was no negligence in caring for the shipment of hogs. Where a shipment of live stock is not accompanied by a caretaker it is sufficient to show that it was delivered to the carrier in good condition and that it was delivered or received at its destination in bad condition. The burden is then on the carrier to show that the loss or injury was not the result of its negligence, unless the shipper assumes the burden of proving negligence by alleging such instead of relying, as was done in this case, upon the insurer theory. [10 C. J. 379; Moran v. Railroad, supra; Kolkmeyer v. Railway, 192 Mo. App. 188, 196; Morrow v. Wab. Ry., 276 S. W. 1030.]

However, where recovery is sought for sickness of live stock *in transit,* or death caused from sickness, the burden is on plaintiff to prove the carrier's negligence. [10 C. J. 380; 4 R. C. L. 963; Hussey v. Sorrogosa, 12 Fed. Cases 6949, 3 Woods, 380; Ill. Central v. Peel (Miss.), 70 So. 887; Allen v. Mobile Railroad, 102 Miss. 35; St. Louis, etc., v. Brossies, 105 S. W. 1131; Haas v. Pac. Express Co., 48 Mo. App. 179, 183.] The reason given for this exception to the rule is that sickness or death from sickness of live stock may be due to a diseased condition existing at the time or prior to its delivery to the carrier, although not discovered by its owner or the carrier, or may be due to atmospheric, climatic or other conditions, over which the carrier has no control and for which it would not be responsible. [See Ill. Cen. R. R. Co. v. Word, 149 Ky. 229, 233, 234.] The court likewise erred in giving plaintiff's instruction

No. 6 which also placed the burden of showing lack of negligence on the defendant.

We find no error in the refusal of instructions F and G requested by the defendant, St. Louis-San Francisco Ry. Co. These instructions sought to tell the jury that if the hogs died because the weather conditions were such that they became sick from exposure, said defendant was not liable. If the weather conditions combined with the negligence of said defendant to cause the loss, said defendant is liable. [Moran v. Railroad, supra.]

The evidence in relation to the shipment of the hogs covered by the second count of plaintiff's petition shows that the shipment consisted of 153 head of stock hogs shipped from Birch Tree located on a branch line of the initial carrier, St. Louis-San Francisco Ry. Co.; that they moved over the rails of that company to Springfield and thence by a branch line of said defendant, wholly in the State of Missouri, to Kansas City, Missouri, thence over the line of the Chicago, Burlington & Quincy Railroad to Milen in the State of Missouri, and from the latter place to Green Castle over the line of the defendant, Quincy, Omaha &. Kansas City Railroad Company. The hogs were not accompanied by a caretaker.

The evidence shows that Birch Tree is 322 miles from Green Castle by railroad. The hogs were in good condition when they were delivered to the initial carrier at Birch Tree and left there at about one o'clock on the afternoon of April 20, 1927. They arrived at Green Castle about 2:30 P. M. of April 25th, more than five days after they left Birch Tree. Upon their arrival two of the hogs were found dead in the car. Most of them were sick. They were taken to plaintiff's farm about three-quarters of a mile from Green Castle. Some of them had to be hauled there as they were too weak to walk. Eighteen head died and the rest did but little good thereafter; they would not fatten properly. The hogs that recovered were damaged about $10 per head by reason of their illness which was pneumonia contracted *in transit*.

Plaintiff's evidence tends to show that these hogs as well as those covered in the first count were brought to the station at the point of the origin of the shipment in a truck; that these hogs were vaccinated for cholera before they left Birch Tree. Defendants' evidence tends to show that the temperature was sixty degrees the day the hogs left Birch Tree and it rained part of the time. It was not raining while the hogs were being loaded at Birch Tree but it was rainy and cloudy practically all of the day. En route between Willow Springs and Springfield the temperature was sixty degrees, the weather cloudy and there was a "cold rain." The car was moved from Springfield to Clinton on April 22nd. The weather on that

day was "cold and clear." The hogs were fed two bushels of corn and watered at Springfield on April 21st; they were also watered there on the 22nd and fed two bushels of corn. They were fed and watered at Clinton on the evening of April 22nd and the morning of the 23rd. They were given two bushels of corn each time. The hogs were fed and watered at Kansas City at 5:03 A. M., April 24th. A water trough had to be put in the car as the one in it had been bursted. They were fed four bushels of corn at Kansas City. On the evening of April 24th the hogs were fed and watered at Brookfield, the feed consisted of four bushels of corn. One dead hog was removed from the car at that place.

Had the hogs moved over the main line of the initial carrier from Springfield to Kansas City instead of over the branch line through Clinton they would have made the trip from Willow Springs (a point farther away from Kansas City than Springfield) to Kansas City in twenty-four hours, but in this instance it took eighty-four hours and thirty minutes to make the trip from Birch Tree to Kansas City. One hour and fifty minutes were consumed between Birch Tree and Willow Springs, which are twenty-eight miles apart.

Defendant introduced the record of the Government weather bureau showing the minimum temperature at Birch Tree on April 20th to be fifty-eight degrees, at Springfield forty-seven degrees, at the latter point on the 21st thirty-five degrees and on the 22nd thirty-two degrees. The weather reports showed no rain fall at Birch Tree on April 20th or 21st.

This shipment of hogs arrived at Milan, a junction point of the Burlington with the line of the defendant, Quincy, Omaha & Kansas City Railroad Company, between eleven and twelve o'clock noon, April 25, 1927. There was no freight train leaving Milan for Green Castle until the following morning. The section foreman who looked after the animals made the remark that there might be something wrong with them. In order to prevent holding the hogs in Milan until the following day the hogs were taken from Milan to Green Castle by the terminal carrier on a passenger train leaving Milan at two P. M. and arriving at Green Castle at 2:36 P. M. of the same day. It was not customary to handle such cars on passenger trains. The passenger trains on that road did not handle freight cars except on special occasions.

Defendant, St. Louis-San Francisco Railway Company contends that its demurrer to the evidence should have been sustained as to the second count of plaintiff's petition. The reasons given for this contention are substantially the same as those advanced as to the first count. Plaintiff's cause of action is pleaded in this count on the same theory as in the first. The evidence as to the second count tends to show little, if any, rain fell during the transportation of these hogs but that the weather was somewhat colder. There was

no direct evidence that a minimum of thirty-two degrees on one day while these hogs were *in transit* contributed to their sickness and the jury was not required to so find. With the exception of the wet bedding the evidence as to the second count shows the same negligence on the part of this defendant as the evidence as to the first count. Of course, the shipment under the second count was an intra-state shipment and the Federal twenty-eight-hour unloading statute does not apply, but it is well settled that even at common law there is a duty upon the carrier to feed, water and rest live stock *in transit* as far as is reasonably necessary for keeping them in good condition and in the absence of a request by the consignor a request that this be done will be assumed. [10 C. J. 94, 95, 99.]

As to the second count there is another item of negligence not present in the first. There was testimony from which the jury could find that the initial carrier was negligent in delaying the shipment of hogs by sending them over a branch line instead of over its through line. This was a perishable shipment and it should have gone the more direct or main line where shipments moved more rapidly. Defendant's evidence tends to show in effect that plaintiff's agent at Birch Tree requested that they be sent over the branch line, but plaintiff's evidence shows to the contrary. No other delay to this shipment was shown.

Plaintiff's instruction No. 5 is similar to his instruction No. 4 on the first count, and for the reason that instruction No. 5 places the burden on defendants of proving lack of negligence it must be held to be erroneous.

Plaintiff's instruction No. 6 is applicable to both counts. Therefore, there was error in its giving as to the second count as well as to the first.

The defendant, Quincy, Omaha & Kansas City Railroad insists that its demurrer to the evidence should have been sustained. We think this point is well taken. No negligence was shown on the part of that company in reference to this shipment. It is claimed by the plaintiff that the liability of these two railroads is joint. There is no merit in this contention. [Utz v. Railroad, supra.] The case of Wyman v. Railway, 4 Mo. App. 35, cited by the plaintiff involves a partnership relationship between the carriers. Evidently there was a through bill of lading issued by the initial carrier in the present shipment but there was no such relationship shown in this case. [See Crockett v. Railroad, 147 Mo. App. 347.] The case of Dean v. Railway, 148 Mo. App. 428, 447, cited by the plaintiff, merely announces the well-established rule that in the absence of evidence the presumption is that the terminal carrier is liable for the loss. This presumption is based upon the fact that a connecting carrier is not required by law to accept a shipment in a damaged condition, therefore, the presumption is that the shipment was in

good condition when it was delivered to it. However, there is no presumption in this case of that character, for the reason that the testimony shows that the shipment was not in good condition when it was delivered to the terminal carrier, but had been mistreated; that the hogs were sick and in a dying condition when that event occurred. In the absence of any testimony tending to show that the terminal carrier was at fault under such circumstances its demurrer to the evidence should have been sustained. [10 C. J. 555.]

The judgment is reversed and the cause remanded. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.