**LUX ART VAN SERVICE, INC.,** a California Corporation, Appellant,

v.

**Art POLLARD,** Appellee.

No. 19397.

United States Court of Appeals
Ninth Circuit.

April 20, 1965.

James Richmond, Chandler, Tullar, Udall & Richmond, Tucson, Ariz., for appellant.

Burt Haberman, Johnson, Darrow, D'Antonio, Hayes & Morales, Tucson, Ariz., for appellee.

Before JERTBERG, KOELSCH and BROWNING, Circuit Judges.

KOELSCH, Circuit Judge.

This is a diversity case, commenced and prosecuted in the United States District Court by Art Pollard against Lux Art Van Service, Inc., (Lux) to recover damages for the death of his horse "Chinchilla" which occurred during shipment by Lux. Trial to the court, sitting without a jury, resulted in judgment for Pollard in the amount of $25,000. Lux has appealed.

Pollard raises quarter horses for racing.[1] His ranch is located in southeastern Arizona, near Tucson. Lux is a common carrier, duly certified by the Interstate Commerce Commission to transport by motor truck in interstate commerce livestock other than ordinary.[2]

Chinchilla was an outstanding brood mare.[3] In January, 1962 Pollard took her from his ranch to the stud farm operated by Vessels Ranch, Inc. near Los Alamitos, a small town in southern California. He had taken other mares there to be bred and it was his regular practice to transport them both ways, using his own equipment and personnel.

---

1. The name derives from their ability to run a quarter of a mile at phenomenally high speed. Such horses are compact and heavily muscled thoroughbreds.

2. Ernest Baum, president of Van Service, explained that "livestock other than ordinary" meant "race horses, showhorses, breeding stock. In other words, registered animals other than ordinary killer stock or butcher, used for butcher purposes."

3. She was 11 years of age at the time of her death—just well into her productive span; all five of the colts she had foaled were rated by the American Quarter Horse Association as Triple A plus—the highest echelon possible for racing quarter horses. Her value was variously estimated at from $60,000–$100,000.

During their stay, which varied from three to six months, the mares were in the care and under the exclusive control of Vessels. When they were well in foal, Vessels so advised Pollard who then fetched them himself.

However, in this instance, Vessels did not notify Pollard, but instead made arrangements with Lux to return Chinchilla. Shortly before noon on July 14, 1962, a Lux truck, operated by John Depew and an assistant, both Lux employees, came to the Vessels farm. Attached to the truck was a large van type trailer, entirely enclosed except for ventilating slits on either end and at intervals along the sides. Inside, the trailer was partitioned into three rows of box stalls, three in each row. Chinchilla was put in the center stall in the first row. The truck and trailer then proceeded on to two neighboring farms, where additional horses were loaded. By 10:30 that evening the truck had reached a point beyond San Diego and was traveling eastward in the vicinity of El Centro when the driver heard an unusual commotion in the trailer. Upon investigating, he discovered that, although the other five horses appeared to be normal, Chinchilla had collapsed in her stall. She was immediately removed from the trailer and a local veterinarian, John C. Pace, was summoned. He arrived soon afterward, but by 11:00 o'clock Chinchilla was dead.

Pollard couched his complaint in two alternative counts; in one he based the claim on negligence and, in the other, on conversion.[4] The district judge predicated recovery on negligence.[5] He found that Chinchilla was "in apparent good, sound condition when accepted by the defendant for shipment * * * ; [t]hat at all times subsequent to the delivery of said mare to the defendant, defendant was in sole, exclusive and absolute custody * * * and possession of [her] * * * ; that the trailer in which the mare "Chinchilla" was transported by the defendant was improperly and inadequately ventilated for shipping a live animal in the middle stall of the forward compartment of said trailer during the prevailing hot weather in the near desert area of southwest California * * * " that the defendant "failed to periodically water the mare * * * so as to counteract the debilitating effects of overheating of the mare * * * " and that as a result she died of heat exhaustion.

Lux contends that there was no substantial evidence to show either that its trailer was in any way unsuitable to transport horses like Chinchilla, or that its employees neglected or improperly cared for her during the trip. It makes a very persuasive argument. The evidence adduced by Pollard on the issue consisted of the testimony of three witnesses, each of whom was allowed to state generally that, in his opinion, a van type trailer of the kind used by Lux did not provide adequate ventilation to safely maintain horses confined inside during hot weather. Lux points out this testimony was all objected to; that the witnesses candidly conceded that they had never used or been concerned with such trailers; that they had no knowledge of their construction, and knew nothing of the manner in which air was circulated in them. Thus, it is doubtful whether their testimony should have been received. In addition, the evidence was that Lux had periodically offered the horses water enroute.

However, in this instance, we need not decide whether Pollard had adduced sufficient evidence of specific acts of negligence. The formal findings do enumerate several such acts, in addition to the general finding of negligence, but the judge made it clear that he also relied upon the rule of evidence commonly referred to as the Doctrine of *Res Ipsa Loquitur*, to reach the ultimate factual

---

4. Although there is some divergence among the authorities, the rule most generally announced is that mere negligence will not support a claim for conversion.

See 53 Am.Jur. Trover and Conversion, in section 52.

5. The allegations set out a general charge as well as specific acts of negligence.

conclusion.[6] And circumstantial evidence satisfying the requirements of the doctrine affords ample support for a finding of negligence. Nor is the questioned proof of specific acts of negligence in this case fatal to the doctrine's application.[7]

■ The rule, or doctrine, as generally expressed is:

"* * * when a thing which causes injury, without fault of the injured person, is shown to be under the exclusive control of the defendant, and the injury is such as, in the ordinary course of things does not occur if the one having such control uses proper care, it affords reasonable evidence, in the absence of an explanation, that the injury arose from the defendant's want of care."

San Juan Light & Transit Co. v. Reguena, 224 U.S. 89, 98–99, 32 S.Ct. 399, 56 L.Ed. 680 (1912). See 9 Wigmore, Evidence § 2509 at p. 377 (3d ed. 1940).

In this milieu, we conclude that resort to the Doctrine was not unwarranted. Dr. Pace testified that the weather was hot, "ninety-five to a hundred." He diagnosed Chinchilla's condition as heat exhaustion and gave that as the cause of her death. The court's finding was to that effect. In addition, Dr. Pace, and several other experts, explained (and their testimony was uncontradicted) that heat exhaustion is brought on by keeping a horse in unduly confined quarters during hot weather, not supplying it with sufficient water, or otherwise failing to keep the animal cool. They also gave testimony, the substance of which was that with proper care, suitable facilities and adequate provision for watering, a horse could be hauled overland in a trailer without suffering any ill effects, regardless of weather conditions.

■ We are fully aware that the doctrine does not ordinarily apply in situations where an animal sustains some physical injury or becomes sick while in

---

6. He said as much. One of the formal Conclusions of Law consists of the recital. "That the Doctrine of Res Ipsa Loquitur is applicable to plaintiff's claim: This doctrine raises the rebuttable presumption that from the occurrence itself, to-wit: the death of the plaintiff's mare, Chinchilla, under the circumstances herein related, the defendant was negligent and that such negligence proximately caused the death of the plaintiff's mare Chinchilla on July 14, 1962 near El Centro, California." When read in context, this statement means that Lux had failed to overcome the inference which the trial judge, as fact finder, derived from the evidence favorable to Pollard, not that the doctrine operated to shift to Lux the burden of proving its freedom from negligence. See Sweeney v. Erving, 228 U.S. 233, 241, 33 S.Ct. 416, 57 L. Ed. 815 (1913); Commercial Molasses Corp. v. N. Y. Tank Barge Corp., 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89 (1941).

7. The following illustration appearing in an illuminating article by Dean Prosser entitled "Res Ipsa Loquitur in California", 37 Cal.L.Rev. 183, 213–214 (1949) serves to demonstrate why, in the case before us, the doctrine survives in spite of the proof given by Pollard's "experts":

"When the plaintiff shows that he was on the defendant's train and the train was derailed, there is an inference that the defendant had been negligent, and a res ipsa case. When he goes further and shows that the derailment was caused by an open switch, he destroys any inference that it was due to excessive speed or defective track; but the inference that the defendant had not used due care in looking after its switches is not destroyed, but considerably strengthened. To say that res ipsa does not apply is to say that the weaker inference may be drawn, but the stronger may not. If the plaintiff goes still further and shows that the switchman was drunk and left the switch open, there is nothing left to infer and the plaintiff must stand or fall on his specific proof. If he shows that the switch was thrown by an escaped convict with a grudge against the railroad he has proved himself out of court. It is only in this sense that when the facts are known there is no room for inference, and res ipsa loquitur vanishes from the case. Particularly when the plaintiff introduces only some circumstantial evidence suggesting a definite cause for the accident it cannot be said that the normal inferences are defeated."

possession of a carrier. This exception is based "on the peculiar propensity of animals to injure themselves and each other," [Missouri Pac. Ry. Co. v. Elmore & Stahl, 377 U.S. 134, 139, 84 S.Ct. 1142, 1146–1147, 12 L.Ed.2d 194 (1964)] and the likelihood that the disease was incipient when the carrier received the animal for shipment. Vaughn v. St. Louis-San Francisco Ry. Co., 223 Mo. App. 732, 15 S.W.2d 901, 906 (1929); Rudy v. Chicago, Milwaukee, St. Paul & Pac. Ry. Co., 5 Wis.2d 37, 92 N.W.2d 367, 370 (1958). Here, of course, we are not concerned with a death resulting from external injury, and the evidence of sickness—if heat exhaustion may be so classified—all points to the conclusion that the condition was not present in any degree whatever when Lux loaded Chinchilla, but instead commenced sometime afterward while she was riding in the van through the hot desert. She had been examined by a veterinary immediately prior to the trip and certified as being in good health, free of contagious disease, and eligible to be shipped from California into Arizona. But entirely aside from that fact, there was evidence that the onset of heat exhaustion is very rapid after an animal has been exposed to an inducing condition; that two hours is "a long time." And Dr. Pace opined that Chinchilla had been exposed to excessive heat "about an hour or close to that" before he saw her. At the latter time, she had been in Lux's exclusive possession for upwards of 10½ hours.

■■ The next point presents a more difficult problem. Lux alleged, by way of affirmative defense, that in any event his liability for the loss was limited to $150.00, that being the value declared by the Vessels Ranch in the Bill of Lading which one of the Vessels employees signed. The cost of transportation was based upon that figure and it appeared that Vessels had not requested that the horse be hauled at any of the higher rates available to shippers who desired greater protection.[8]

At the trial Lux took the position that Pollard had constituted Vessels Ranch his agent to ship Chinchilla. However, the trial judge decided otherwise and held that Pollard was not bound by the limiting provision in the shipping agreement. We agree.

■■ The several bases upon which, and the reasons why, a principal is bound by the acts of an agent are clearly and concisely set out in the following extract from Law v. Stokes, 90 Am.Dec. 655, 656–657 (N.J.1867):

"A principal is bound by the acts of his agent within the authority he has actually given him, which includes not only the precise act which he expressly authorized him to do, but also whatever usually belong to the doing of it or is necessary to its performance. Beyond that he is liable for the acts of the agent within the appearance of authority which the principal himself knowingly permits the agent to assume, or which he holds the agent out to the public as possessing. For the acts of his agent, within his express authority, the principal is liable, because the act of the agent is the act of the principal. For the acts of the agent, within the scope of the authority he holds the agent out as having, or knowingly permits him to assume,

8. Public policy renders void any agreement exempting a common carrier for liability caused by its own negligence. The Carmack Amendment [49 U.S.C. § 20(11)] to the Interstate Commerce Act permits limitation of liability where a choice of rates is offered varying with the value of the property to be shipped. Union Pacific R.R. v. Burke, 255 U.S. 317, 41 S.Ct. 283, 65 L.Ed. 656 (1921). And the limitation is binding even though, as here, it is grossly disproportionate to the actual value of the shipment. Pierce Co. v. Wells Fargo & Co., 236 U.S. 278 (1915).

Authority to ship confers upon the agent the incidental authority to enter into a valid contract with a carrier concerning liability. Frohlich Glass Co. v. Pennsylvania Co., 138 Mich. 116, 101 N.W. 223 (Mich.1904). 1 Mechem, Agency, § 1046 (1914); 14 Am.Jur.2d Carriers, § 551; Bates v. Weir, 121 App. Div. 275, 105 N.Y.S. 785 (1907).

the principal is made responsible; because to permit him to dispute the authority of the agent in such cases would be to enable him to commit a fraud upon innocent persons. In whichever way the liability of the principal is established, it must flow from the act of the principal. And when established, it cannot, on the one hand be qualified by the secret instructions of the principal, nor on the other hand be enlarged by the unauthorized representations of the agent."

Lux does not contend that Pollard had expressly requested Vessels Ranch to return Chinchilla to him or have her returned by someone else. Indeed, it appears that Pollard was entirely unaware of Vessels' action. Nor does the evidence require the conclusion that such authority existed because of a past course of dealing between Pollard and Vessels, or some general practice commonly followed by those engaged in the business of breeding horses. Rather, as Lux states in brief:

"What defendant does contend is that plaintiff, by placing his mare temporarily in the exclusive control of vessels Ranch, necessarily vested his bailee with apparent authority to return the mare to its owner and, for the purpose of effecting such shipment, to enter into a contract binding upon the owner."

Accurately speaking, "apparent authority" is not authority at all, but is merely a power to affect the principal's affairs. As already noted, it arises not by authorization in the consensual sense, but from the principal's negligent omission or his acquiescence in the agent's activities. See 1 Mechem, Agency, §§ 720–726 (1914). The law gives to the latter the effect of representation to the party dealing with the "agent" that the "principal consents to have the act done on his behalf." Restatement, Agency 2d § 27 (1958). To apply the rule of apparent authority, there must therefore be some basis for what may be loosely termed an estoppel against the

principal. And this "estoppel" depends upon manifestations by the principal to the third party and not to the agent. Restatement, Agency 2d § 49(b) (1958) indicates that "if there is a latent ambiguity in the manifestations of the principal for which he is not at fault, the interpretation of the apparent authority is based on the facts known to the principal."

In this case the sole basis of an "estoppel" against Pollard must rest upon the fact of Vessels' possession. The rule is of long standing, however, that possession of a chattel, standing alone, does not authorize an agent to affect the principal's interest. As the Restatement, Agency 2d § 200 (1958) summarizes the law,

"[a]part from statute, an undisclosed principal who entrusts an agent with the possession of a chattel, other than a commercial document representing a chattel or chose in action, but who does not authorize him to sell it, display it for sale, or otherwise affect the principal's interest in it, is not thereby bound by a transaction with respect to the chattel between the agent and a third person who believes the agent to be the owner."

The reason is plain: mere possession carries no indication of any right to engage in transactions of serious consequence to the owner of the chattel. Possession is as consistent with tortious acquisition as with full ownership and provides no basis for an assumption that the possessor may deal with the chattel as he pleases.

We think the circumstances of this case preclude a finding that the Vessels Ranch had apparent authority to ship the mare. Here we had an obviously valuable horse to be shipped on a long and arduous journey across one of the hottest areas of the United States. The numerous risks attendant such trip convince us that an owner must do some act of greater significance than to merely relinquish possession before being deemed to have undertaken the risks of this

shipment. Cf. Mitchell v. Union Pac. Railroad Co., 242 F.2d 598, 603–604 (9th Cir. 1957).

Our conclusion is fully consonant with the high standards of care imposed on carriers, as illustrated by the case of Missouri Pac. R. R. Co. v. Elmore & Stahl, supra, 377 U.S. 134, 84 S.Ct. 1142, 12 L.Ed.2d 194, and is merely an application of the familiar rule that where one of two innocent parties must suffer, the loss falls on him who made it possible. It bears emphasis that the carrier's negligence caused the loss.[9] Realistically, the effect of our conclusion is to deprive the carrier of the slightly higher charge that it would have made had the mare been declared at full value.

The judgment is affirmed.

9. As an equitable ground for relief, Lux points out the plight of common carriers who must accept shipments from whomever tenders them. But that consideration appears of little weight when measured against an owner's opportunity to protect himself. The carrier need only exercise due care to prevent a loss. The owner, on the other hand, is powerless to do so.