Arthur CAPETOLA and Frances Capetola, Individually and trading as Dina Management and Dawn Robertson

v.

Tony ORLANDO and Telma Hopkins and Joyce Vincent Wilson.

Civ. A. No. 76–1119.

United States District Court, E. D. Pennsylvania.

Dec. 14, 1978.

Jerome J. Verlin, Philadelphia, Pa., for plaintiffs.

Thomas A. Masterson, William P. Cole, Philadelphia, Pa., for defendants.

## OPINION

DITTER, District Judge.

In this civil suit, plaintiffs are Arthur and Frances Capetola, a married couple, and their daughter, Joan (Dawn) Capetola Robertson.[1] The parents sue individually and as the partnership, Dina Management, in which Arthur and Frances are the sole partners. The complaint seeks injunctive and monetary relief against the well-known entertainer Tony Orlando and two of his associates for the alleged infringement of a trademark.

Presently before me is the defendants' motion for partial summary judgment. After considering the able arguments and briefs of counsel, I conclude that the motion must be denied in all respects.

### I. *Facts*

The facts pertinent to the disposition of this motion can be stated as follows. Arthur and Frances Capetola are citizens and residents of the Commonwealth of Pennsylvania. Their daughter, Joan, was born July 22, 1951. She embarked on what proved to be a promising singing career at approximately eight years of age. For professional purposes, Joan assumed the name "Dawn" in 1960, and she continued to use this name in interstate commerce for some ten or eleven years, both as an individual and as a member of a group variously called "Dawn" and "The Dawn."

When Joan reached the age of 12, her parents decided that it would be advisable to have a guardian appointed whose responsibility it would be to procure contracts on the child's behalf and "oversee" her career. Pursuant to the parents' petition, therefore, the Orphans' Court Division of the Court of Common Pleas, Philadelphia County, appointed Harry Back, Esquire, as "Guardian of the Estate of Joan Capetola a minor under the age of 14 years." It was further decreed that all proposed contracts on Joan's behalf were to be submitted to the Orphans' Court and were subject to its approval.

On March 25, 1963, Arthur and Frances Capetola, together with one Nancy Stephens, established Dina Enterprises, Inc., for the purpose of providing career management services to artists, musicians, singers, conductors and other persons in any field of artistic endeavor. Shares of stock in the corporation were issued to numerous individuals, including Harry Back, Esquire. Frances was elected president of the corpo-

1. Ms. Robertson identified herself as Dawn Robertson in the caption of the complaint. Since "Dawn" is itself the trademark which is disputed in this case, I shall hereafter refer to the plaintiff as Joan or Joan Robertson. This is done solely to avoid confusion, and it should not be construed as a suggestion or finding on my part that Ms. Robertson is not entitled to call herself "Dawn."

ration, and she proceeded to secure numerous management contracts with individual and group musical entertainers.

On July 15, 1964, pursuant to the petitions of Harry Back as Joan's guardian, the Orphans' Court approved two contracts. The first was an agreement with Dina Enterprises, Inc., whereby the corporation was empowered to act as Joan's agent and manage her affairs as a professional artist. The second agreement involved Joan, one William Carlucci, and Mercury Records Productions, Inc. This contract provided that Joan and Carlucci were to make a record to be issued by Mercury, and identifying the performing artists as "Billy and Dawn." Joan, Arthur, Frances and Mr. Back all signed the contract. Arthur and Frances also signed an express warranty giving Joan and Carlucci exclusive rights to the name "Billy and Dawn." Evidently, the proposed record was never produced as Mercury rescinded the contract in October of 1964.

Mr. Back died in 1967, and no successor guardian was ever appointed for Joan. At about this time, Dina Enterprises, Inc. ceased doing business, and in late 1967, Arthur and Frances formed "Dina Management," a partnership whose purpose was to provide the services previously offered by Dina Enterprises, Inc. Also in late 1967, the partnership assumed responsibility for managing Joan's professional career under an oral agreement, the terms of which were substantially similar to those of the written contract between Mr. Back, Joan's guardian, and Dina Enterprises, Inc., approved by the Orphans' Court in 1964. The plaintiffs assert, however, that the oral agreement differed from the prior written contract in one major respect. By the terms of the oral contract, plaintiffs allege that Joan transferred all right, title and interest in the name "Dawn," "The Dawn," or any derivative thereof, exclusively to Dina Management. Thereafter, an entertainment group called "The Dawn" was formed around the talents of Joan. The plaintiffs allege that Dina Management granted Joan a license to use the name "Dawn" or "The Dawn" in connection with the activities of this group. Joan continued to perform with the group, using the "Dawn" name until late 1971 or early 1972,[2] during which time the group performed in club engagements and made recordings, some of which achieved standing on nationally recognized weekly charts. Dina Management promoted and managed the group's affairs throughout this period.

At this point, the activities of David Appel and his associates, producers of phonograph records, become relevant. In 1970, Appel acquired a song which was to become known as "Candida." In need of a performer to sing the male lead, Appel contacted defendant Orlando, who agreed to record the song, on the condition that he not be identified as the performing artist. Orlando was at that time an executive with the April-Blackwood music publishing company and he wished to continue his pursuit of that employment.[3]

"Candida" thus was recorded by Orlando together with an unspecified number of female background singers and an instrumental ensemble. When the record was issued in the summer of 1970, the performing artists were collectively identified as "Dawn," a name chosen by David Appel for an unknown reason.[4] The parties agree that prior to his work in New York City, David Appel was a native of the Philadelphia

---

**2.** Defendants contend that Joan's use of "Dawn" in association with the group terminated in the fall of 1971. Plaintiffs, on the other hand, alleged that this use continued until January of 1972.

**3.** In deference to Mr. Orlando, it should be noted that the terms of his employment with April-Blackwood did not prevent him from engaging in recording activities. On the contrary, he was encouraged to do so. His initial desire for anonymity has not been fully explained to me, and apparently, it is of no significance to the dispute between the parties in this action.

**4.** There is nothing to indicate the origin of the name "Dawn" as applied to the Orlando group, other than the agreed statement that it was "chosen or made up by Dave Appel." Plaintiffs assert that prior to the issuance of "Candida," neither Appel nor Orlando was in any way associated with the name "Dawn," and they have never attempted to register it as a service mark.

area, during which time he knew of both Joan and Frances Capetola, and he was aware that Joan performed under the name "Dawn."

When the "Candida" recording was issued in 1970 with its artists identified as "Dawn," it came to the attention of Frances Capetola. She contacted David Appel and discussed with him Dina Management's exclusive claim to ownership of the "Dawn" name. At this point, Appel told Frances that he was in need of a road group to perform promotional services for the Orlando record, since Orlando was unwilling to forego his anonymity. He suggested that Frances and her "Dawn" group[5] should come to New York and discuss such an arrangement. A meeting for this purpose was scheduled to be held during the following September, thereby giving the Capetola group time to complete an engagement in New Jersey.

Meanwhile, Arthur and Frances discussed the entire matter with legal counsel, and on September 17, 1970, they filed an application for registration of the service-mark "The Dawn" on behalf of "Arthur Capetola and Frances Capetola doing business as Dina Management, a partnership." After requiring that the application be amended to identify the applicant as "Dina Management, a partnership consisting of Arthur Capetola and Frances Capetola," the United States Patent Office granted the registration on May 2, 1972.[6] On the same date that the application was filed, September 17, 1970, Joan and six other performing members of the Capetola group executed a document which read in pertinent part:

> To whom it may concern:
>
> We the, undersign (sic) and members of the vocal group called "The Dawn", state that we individually and jointly have no

right to service mark or name "The Dawn", and acknowledge that said service mark is the exclusive property of Frances Dina Capetola and Arthur William Capetola, a firm doing business as Dina Management.

Just prior to or immediately after the filing of the application on September 17, the scheduled meeting with David Appel took place. At Appel's request, Joan and one Franny Tesch, a male member of the Capetola group, sang "Candida." After some ensuing discussion, Frances and Appel then reached an agreement which leaves me a bit mystified. The agreement called for the Capetola group "to become the road or recording group for the Orlando releases." Under this arrangement, the Capetola group would tour the country, making public appearances for the purpose of promoting Orlando's "Candida," as well as future Orlando recordings. This included not only performing the songs, but also appearing at record stores and shopping centers, autographing copies of the records, and otherwise promoting the sales of the Orlando recordings.

It is to be remembered that during this time period, the consuming public was unaware of Orlando's identity as the lead male singer in "Candida" or any other recording. Rather, "Candida" and three subsequent records were released with their recording performers identified only as "Dawn." The apparent effect of the agreement between David Appel and Frances Capetola, therefore, was to create the impression that the Capetola group, which was doing the promotional roadwork, had actually recorded the songs. This arrangement evidently redounded to the mutual advantage of both groups. The Capetola group benefited by gaining increased exposure and retaining

**5.** At this point in the factual narrative, we are dealing ·with two performing groups, both of which called themselves "Dawn." For simplicity sake, I will hereafter refer to the group formed around Joan Robertson and managed by Arthur and Frances Capetola through Dina Management as "the Capetola group." Similarly, I will refer to the group which included Tony Orlando and which performed the original recording of "Candida" as "the Orlando group." This is done only to avoid confusion, and it is to have no bearing on any conclusion as to whether either or both of these groups is or was entitled to call themselves "Dawn."

**6.** The Patent Office assigned the registration number 933,417 to the service-mark "The Dawn," registered to Dina Management.

all performance fees. Appel and Orlando benefited by obtaining permission to continue in their use of the "Dawn" name and earning increased royalties from record sales, all the while preserving Orlando's anonymity.

The agreement was carried out for about one year, from September, 1970 until the fall of 1971. During this time, as agreed, the Capetola group appeared all over the United States, representing itself "as the recording or road group" for "Candida," and for subsequent Orlando releases.[7] At least the next three Orlando recordings [8] were released and promoted in the same way, i. e., the actual recording was done by the Orlando group, the recording artists were identified only as "Dawn," and the promotional roadwork was performed by the Capetola group.

This amicable relationship deteriorated quickly in the summer of 1971 when Orlando left his position with April-Blackwood, obviously intending to pursue his career as an entertainer on a fulltime basis. On July 20, 1971, Orlando purchased from Appel and his associates all the right, title and interest they possessed in the name "Dawn" and its attendant good will. In consideration, Appel received $77,500., plus a percentage of all recording royalties that Orlando earned. Plaintiffs allege, however, that no compensation arrangement was ever made with the Capetola group. At this point, Orlando began making public appearances to promote his recordings personally, and it was also approximately at this time that he began his association with defendants Telma Hopkins and Joyce Vincent Wilson.

When Orlando began making his public appearances, he had knowledge of the Capetola group's promotional activities.[9] Thereafter, his attorney, Miles Lourie, Esquire, of the New York Bar, began sending correspondence to the Capetola group, demanding that they cease their use of the name "Dawn" and claiming that Orlando was the "exclusive owner of all rights to the name 'Dawn' as a designation of a musical performing group." [10] Lourie also contacted numerous night clubs, advising them not to book the Capetola group due to Orlando's ownership of the "Dawn" name, and implying that the clubs would suffer "additional unpleasantness and expense" if they refused to cooperate.[11] Despite these efforts, the Capetola group continued to perform as "Dawn" but found it increasingly difficult to do so.

In December of 1971, Mr. Lourie proposed a settlement of the dispute which, in essence, would have limited use of the name "Dawn" by the Capetola group and Dina Management to "Dawn and Her Review." This was rejected by the Capetolas and a subsequent meeting of the parties aimed at achieving a settlement proved equally fruitless. At this point, Frances and Arthur contemplated litigation, but for want of the requisite financial resources, they postponed the undertaking indefinitely.

Meanwhile, the adverse efforts of Orlando and his counsel, coupled with Orlando's own rise to fame in association with the "Dawn" name, had so diminished bookings for the Capetola group that it was no longer economically feasible for them to appear as "Dawn." Thus, in January of 1972, they began to appear under the name "Hera," but enjoyed little success and soon disbanded. In late 1974 or early 1975, a new group called "Sandy" was formed, featuring Joan.

---

7. Counsel for both parties have made it clear that at no time did any member of the Capetola group represent themselves to be Tony Orlando or anyone else, other than, in the words of plaintiffs' counsel, "what they truly were: the group 'Dawn,' the recording or road group of 'Candida' and other Orlando recordings."

8. These three recordings included "Knock Three Times," "I Play and Sing," and "Summer Sand."

9. The parties are in dispute as to exactly when Orlando *first* became aware of the Capetola group's activities on behalf of his recordings.

10. Mr. Orlando asserts that he had no knowledge of Mr. Lourie's letters to the Capetola group and did not authorize the attorney to send them.

11. Mr. Orlando also denies any knowledge of letters sent by Mr. Lourie to night clubs. See note 10, supra.

Like "Hera" and the Capetola "Dawn" group, Sandy was managed by Dina Management. After a year without success, it too disbanded.

During the same period, Orlando and his associates, Hopkins and Wilson, achieved considerable prominence, including performances on national network television, under the names "Dawn," "Dawn, featuring Tony Orlando," and "Tony Orlando and Dawn."

In June of 1977, Joan and her husband, John Robertson, together with Dina Management resumed use of the name "Dawn" as a designation for a musical group.

## II. *Preliminary Questions*

Defendants have prefaced their motion with certain preliminary problems, and I will address myself to these matters before proceeding to the substantive issues.

First, defendants suggest that for the purposes of this litigation, no significant distinction should be drawn between "Dawn" and "The Dawn." It is clear that the mark registered by plaintiff Dina Management with the patent office is "The Dawn." Nevertheless, plaintiffs have not objected to defendants' suggestion, and I agree that the difference between "Dawn" and "The Dawn" is without trademark significance within the confines of this case.

Second, defendants assert that there is no significant distinction between individual and group performances for the purposes of this case. Again, plaintiffs have not objected. I note that "Dawn" seems more readily applicable to the individual, Joan Robertson, since she has apparently assumed this as her first name. "The Dawn," on the other hand, is more frequently used in reference to the group. Since I have already concluded, however, that no meaningful distinction exists between "Dawn" and "The Dawn," I can see no useful purpose that might be served by distinguishing between individual and group entertainment while resolving the trademark issues presented in this litigation.

Third, the defendants contend that Arthur Capetola and Frances Capetola, as individuals, have no standing, and should be dismissed as plaintiffs in this case. Plaintiffs have offered no response to this argument. In accordance with Rule 2127 of the Pennsylvania Rules of Civil Procedure, the caption of the complaint identifies the partnership plaintiff as "Arthur Capetola and Frances Capetola . . . trading as Dina Management." See *In re Penn Central Transportation Co.*, 419 F.Supp. 1376, 1381 (E.D.Pa.1976). In addition, Arthur and Frances have sued individually. The complaint, however, does not disclose any claim for relief by these individuals that can be distinguished from the claims made on behalf of the partnership. Nevertheless, I can see no practical reason to dismiss these plaintiffs at this stage. If, at the close of the plaintiffs' evidence, no separate and distinct claims for relief have been asserted on behalf of Arthur and Frances Capetola as individuals, they can be dismissed at that time.

Fourth, defendants argue that Joan Robertson and Dina Management could not simultaneously claim actionable rights in the "Dawn" trademark. This, however, is plainly erroneous. The plaintiffs contend that Dina Management is the owner of the mark, and that Joan has used it since 1967 pursuant to a license granted to her by Dina. If this is so, then Dina Management and Joan would be united in interest as licensor and licensee. They would both have actionable rights at the same time, and they both must join in any action to enforce either's rights under the trademark. 3 Callman, Unfair Competition, Trademarks and Monopolies § 78.2, at 470 (3d ed. 1969) [hereinafter cited as Callman].

Fifth, defendants raise a largely academic argument which asserts that plaintiffs' statutory and common law causes of action must stand or fall together. The defendants' position is that Dina Management never validly acquired any right, title, or interest in the "Dawn" trademark, and that the statutory act of registration could

not in itself confer any rights that the plaintiff had failed to acquire at common law. This position may well be sound, but it is not properly reached at the present stage of the litigation. The question raised here by the defendants depends on the terms and validity of the 1967 oral agreement between Joan Robertson and Dina Management. The terms and validity of that agreement, in turn, are central issues in the resolution of this case, and I hold, infra, they cannot be decided on the present record.

■ Finally, the last of the defendants' preliminary arguments is that neither Joan Robertson nor Dina Management have capacity to bring this suit at all since they have not registered under the Pennsylvania Fictitious Names Act, Pa.Stat.Ann. tit. 54, §§ 28.1 et seq. (Purdon). In response, plaintiffs correctly cite *Macy v. Oswald*, 198 Pa. Super. 435, 182 A.2d 94 (1962). As the *Macy* case demonstrates, since defendants have always known the true identities of "Dawn" Robertson and the persons trading as Dina Management, they are estopped from denying plaintiffs' right to maintain this action and seek relief.

III. *Dina Management's Rights in the "Dawn" Trademark*

■ The first of two substantive arguments advanced by defendants in support of their motion for summary judgment is that the Dina Management partnership was never the true owner of the "Dawn" trademark, and that Dina's registration of the mark should therefore be canceled. Plaintiffs allege that in 1967, Joan Robertson orally transferred all her right, title and interest in the mark to Dina Management, and it is on the strength of this assignment that Dina claims ownership entitling it to register the mark. Defendants, however, contend that the purported oral transfer is

void for two reasons. First, they argue that Dina Management was never really more than an agent to Joan as principal. Thus, any use Dina made of the "Dawn" name was only in Joan's behalf, and the partnership could not thereby acquire rights of its own in the trademark. Therefore, defendants now ask me to rule as a matter of law "that Dina Management's use of the mark inured to the benefit of Joan."

It is clear, however, that such a ruling at this stage would be manifestly premature. Plaintiffs oppose the argument that Dina acted only as Joan's agent and they vigorously deny that Dina's use of the "Dawn" mark inured to Joan's benefit. On the contrary, plaintiffs assert that Joan orally transferred ownership of the mark to Dina in 1967, and that Joan thereafter used the mark under the grant of a license from Dina.

Plainly, this raises a substantial question of fact which can only be resolved after the development of a complete record on the circumstances surrounding the 1967 oral transfer. We must determine who participated in formulating the agreement, what its terms were, how they were expressed, and whether they were clearly understood by the parties. It may also be relevant to examine evidence regarding the subsequent acts of Joan Robertson, Arthur and Frances Capetola, Dina Management, and the other members of the Capetola "Dawn" group to see if the conduct of all concerned was consistent with the alleged oral transfer.

The present record consists of the pleadings, the depositions of various persons,[12] including Frances and Arthur Capetola and Joan Robertson, answers to interrogatories, and answers to requests for admissions. While these documents may shed some light on the factual question involved, they are wholly inadequate to support a grant of summary judgment.[13] I am guided here by

---

**12.** I note that the transcripts of these depositions have not yet been filed with the Clerk of the Court, and I advise the parties to see that this is done.

**13.** The deposition testimony is, at best, inconclusive. We are faced here with material is-

sues of fact concerning the existence and terms of an alleged oral agreement between Joan Robertson and Dina Management in 1967. Plaintiffs contend that by this oral agreement, Joan conveyed all ownership rights in the "Dawn" trademark to Dina. The parties seem to agree that an earlier written agreement be-

the recent language of the Court of Appeals concerning the standards that govern a motion under Rule 56 of the Federal Rules of Civil Procedure:

> A motion for summary judgment is properly granted only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The burden is on the moving party to demonstrate that the test is met, and the non-moving party is entitled to the benefit of all reasonable doubts and inferences that may arise in connection with the consideration of such motion. In applying this standard to the issues in the present case, we are mindful of the Supreme Court's admonition in a celebrated antitrust case that "[t]rial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.'"

*Harold Friedman, Inc. v. Thorofare Markets, Inc.*, 587 F.2d 127, at 131 (3d Cir. 1978), citing Fed.R.Civ.P. 56(c), and quoting *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). The record now before me is sparse, and what little evidence it contains relative to the 1967 oral agreement can be read in varying and contradictory ways.[14] I will therefore decline to rule as a matter of law that Dina Management's use of the "Dawn" trademark inured to the benefit of Joan, and I will deny the motion for partial summary judgment insofar as that motion is based on the argument that the 1967 oral agreement did not, by its terms, convey ownership rights to the partnership.

Secondly, defendants argue that Dina Management was never the owner of the trademark because, regardless of what the parties *intended* to do by means of the oral agreement, the transaction as a matter of law could not have effected a transfer of rights from Joan to Dina Management or anyone else. Defendants' position here is based on the assertion that Arthur and Frances Capetola were bound by the Orphans' Court decree which required that any contracts executed on Joan's behalf were subject to approval by that court. The parties all agree that no such approval was ever sought or received. By virtue of the decree, say the defendants, Joan lacked "apparent authority" to convey her rights on her own. Thus, it is argued, since Joan, the transferor, could not convey anything, Dina Management, the transferee, could not acquire anything.

In support of their position, defendants cite a principle of trademark law which states that if the transferor of a trademark has "no apparent authority to dispose thereof, the transferee is in the same position 'as the purchaser of a chattel from a bailee who had no power to sell it.'" *Callman*, supra § 78.4(b), at 489. While I do not dispute the validity of this principle, I find that it does not aid the defendants here.

tween Joan, by her guardian, Harry Back, and Dina Enterprises, Inc., did *not* transfer any ownership rights from Joan to the corporation. The deposition testimony of both Frances Capetola and Joan Robertson clearly supports the *existence* of the 1967 oral agreement. Dep. of Frances Capetola, Dec. 21, 1977, at 15; Dep. of Joan Robertson, Dec. 21, 1977, at 85. As to the *terms* of that agreement, however, the depositions are confusing. Frances Capetola testified that subsequent to the execution of this agreement, Dina Management gave Joan "permission" to use the "Dawn" name, thereby clearly supporting the conclusion that the partnership had acquired ownership of the mark. Dep. of Frances Capetola, Dec. 21, 1977, at 15. She also testified, however, that the oral agreement was substantially the same as the earlier written contract, which did not convey any ownership rights, and that there had been no other agreement or transaction between Joan and Dina Management. Id. at 21–22. Similarly, Joan testified that the partnership gave her "permission to use the trademark." Dep. of Joan Robertson, Dec. 21, 1977, at 86. Her testimony thereafter is quite difficult to follow, but at two points she appears to state that she did, in fact, convey her rights to her parents. Id. at 88, 89. If anything, this supports plaintiffs' position rather than defendants'. Since I am not at all certain, however, that the witness even understood what was being asked of her, I can only conclude that a material issue of fact remains, and it must be resolved after a full trial on the merits.

14. See note 13, supra.

■ The issue of "apparent authority" usually arises in the context of a principal and agent relationship where the agent transacts business on behalf of his principal with third parties. "Apparent authority" is said to exist where there has been no grant of *actual* authority, but the acts or omissions of the principal lead third parties reasonably to conclude that the agent is in fact authorized. In such a case, the agent is said to have apparent authority, and his acts bind the principal despite the lack of actual authorization. See *N. L. R. B. v. Donkin's Inn, Inc.*, 532 F.2d 138 (9th Cir. 1976); *Lux Art Van Service, Inc. v. Pollard*, 344 F.2d 883 (9th Cir. 1965); *Continental-Wirt Electronics Corp. v. Sprague Electric Co.*, 329 F.Supp. 959 (E.D.Pa.1971).

At first blush, it may seem that the "apparent authority" concept has no bearing whatever on the instant case. At the time of the alleged oral transfer, Joan was not acting as agent for anyone. Rather, she owned the "Dawn" trademark by virtue of her continuous use thereof since 1960, and she acted on her own behalf in conveying the mark to Dina Management. If she was not legally capable of effecting such a transfer, it was only because the Orphans' Court had not given its approval. There was no principal involved whose authorization was required.

I assume, therefore, that defendants are really arguing by analogy to the "apparent authority" concept. Their position, as I understand it, is that since Arthur and Frances Capetola, the partners in Dina Management, knew of the Orphans' Court Decree, they were aware that Joan lacked "authority" or legal capacity to convey the mark. Dina Management, therefore, could not have acquired the ownership rights that it claims.

■ It is certainly true that where a third party has reason to know that authority does not exist, or once having existed has now been revoked, the agent's acts are ineffective and they do not bind the principal. See *Reading Co. v. Dredge Delaware Valley*, 468 F.2d 1161, 1163 (3d Cir. 1972). By analogy, then, it could be argued that if Arthur and Frances Capetola had reason to know of Joan's incapacity to convey title, her transfer to them was ineffective.

On the present record, however, I have no basis for concluding that Arthur and Frances Capetola were aware of any such incapacity on Joan's part. Obviously, they knew of the Orphans' Court decree and its provisions. This does not mean, however, that they knew Joan could not legally transfer title. The decree required that contracts entered into on Joan's behalf had to be approved by the Orphans' Court. Arthur and Frances Capetola may well have thought that this applied only to Joan's professional contracts which committed her to the performance of entertainment services. Indeed, their only contact with the operation of the decree was in this context. Arthur and Frances are presumably lay persons and the extent of their legal knowledge, if any, has not been established. Perhaps they were not even sophisticated enough to know that the oral transfer was a "contract" at all within the meaning of the Orphans' Court decree.

The point here is that the parents' knowledge of Joan's authority or lack thereof to effect the transfer in dispute is a question of fact that must await resolution after a trial on the merits.

■ Even if it were conceded, however, that Arthur and Frances were aware of an incapacity on Joan's part to convey title, I would still not rule that the transfer was ineffective, nor, therefore, would I grant summary judgment. Clearly, Joan owned title to the "Dawn" trademark. The only incapacities on her part to convey that title were the Orphans' Court decree, and the fact of her own minority.[15] These inca-

---

15. With regard to the fact of Joan's minority, it is doubtful that this incapacity could act as a bar to the effectiveness of the contract since the contracts of a minor are merely voidable, not void, *Rineer v. Kline*, 9 D. & C.2d 670 (1956), and Joan's action in joining as a plaintiff in this suit almost certainly constitutes a ratification following the attainment of her majority. See *Campbell v. Sears, Roebuck & Co.*, 307 Pa. 365, 161 A. 310 (1932).

pacities existed solely for Joan's benefit. It cannot be seriously suggested that they were intended to protect third persons, such as the defendants herein, who were not even parties to the transfer in question. Defendant's position thus violates the rule against assertion of the defense of another, and it appears that defendant's argument must be rejected for want of standing to raise it. See *Gilmore v. Utah*, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976). I will therefore deny the motion for partial summary judgment insofar as it is based on the argument that the 1967 oral contract could not have effectively conveyed ownership rights to Dina Management.

### IV. *The Appel Transactions*

The second substantive ground raised by defendants in support of their motion for summary judgment is that if any plaintiff ever had any rights in the "Dawn" trademark, those rights were lost by means of the plaintiff's transactions and association with David Appel, defendant Orlando's predecessor.

The arrangements and course of dealing between plaintiffs and David Appel were described at length in the factual narrative at the beginning of this opinion. Defendants now argue that they are entitled to summary judgment because: (1) plaintiffs granted Appel a "naked license;" (2) the plaintiffs abandoned their right to exclusivity in the trademark; and (3) the plaintiffs are estopped from pursuing their remedies for infringement because they acquiesced in and affirmatively assisted the allegedly infringing acts.

Plaintiffs vigorously deny all three of these allegations. Rather than granting Appel a naked license, plaintiffs argue that they granted him a *controlled* license to record only, reserving to themselves the exclusive right to promote and perform the Orlando recordings. Further, plaintiffs deny ever having any intention to abandon their trademark. Rather, they point out that they reserved extensive rights in themselves and they only stopped using the mark when Orlando's "harassing and infringing"

acts made it impossible for them to continue performing as "Dawn" or any derivative thereof. Finally, the plaintiffs insist that they did not acquiesce in or assist Orlando's infringing acts. They assert that, to their knowledge, Orlando committed no acts of infringement during their year of association with David Appel. They claim that they objected as soon as the acts of infringement came to their attention.

These issues need not detain us long at the present time, since they cannot be decided on the current record. Obviously, many material questions of fact are presented. Under the standards discussed earlier governing the disposition of motions for summary judgment, I would be remiss in deciding these factual issues on the basis of the sparse record now before me. Defendants themselves concede that resolution of these questions involves, at least in part, a determination of plaintiffs' subjective intent. Such a determination is best made after a full trial on the merits. I shall therefore deny the motion for partial summary judgment insofar as it is based on the argument that plaintiffs lost whatever trademark rights they may have had through their dealings with David Appel.

### V. *Attorney's Fees*

Defendants have also moved for an award of attorney's fees on the ground that this is an "exceptional case" within the meaning of the Lanham Act. Since I have denied the motion for summary judgment in all respects, it is unnecessary for me to discuss the attorney's fees motion other than to say that it too is denied.